UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORENZO LAMAR PEAY,<br><br>    Petitioner,<br><br>v.<br><br>KATHLEEN ALLISON, Secretary, et al.,<br><br>    Respondents. | Case No.: 20cv2388-WQH (KSC)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND GRANTING A CERTIFICATE OF APPEALABILITY** |

Presently before the Court is a Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254 by Lorenzo Lamar Peay, a state prisoner proceeding by and through counsel. (ECF No. 1.) Respondent has filed an Answer and a Notice of Lodgment of the state court record. (ECF Nos. 6-7.) Petitioner has filed a Traverse.[1] (ECF No. 9.)

**I.    Background**

A jury found Petitioner guilty of one count of rape of an unconscious person and one count of rape of an intoxicated person, for which he was sentenced to six years in state prison. (ECF No. 7-1 at 187-88, 191.) The jury began their deliberations on a Friday

---

[1] Although this case was referred to United States Magistrate Judge Karen S. Crawford pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for the disposition of this matter. *See* S.D. Cal. Civ.L.R. 71.1(d).

1

afternoon and deliberated for about one and one-half hours that day and the same amount of time Monday morning. (*Id.* at 182-83.) After their Monday morning break, a public defender unconnected to the case informed the trial court:

> I was in the elevator, I would say about an hour ago, and I - there were four jurors in the elevator, two of which had bagels in their hands. [¶] And they were eating their bagels and they were talking about how long this was going to go on and when could they get this done, and there was a Hispanic female asking if it could be over and wasn't the judge going to make - wasn't there a cut-off point. And the gentleman was saying no, it goes until we finish. [¶] And one of the females, a young female with a ponytail today, and I think she has on a black shirt, said, "well, nothing's going to change my vote. I'm tired of this. We just need to be done. Nobody's going to sway me." [¶] And the other girl's, like, "Yeah, me too. But maybe if we take a break and eat our bagels and step outside." [¶] And the one, I want to say the girl with the ponytail - I stood motionless. I didn't speak. I didn't - I don't have my I.D. visible. I just had a file in my hand. And said something about, "If we can just get to convicting," something of that effect.

(ECF No. 7-7 at 4.)

When asked by the trial judge if there were "any discussion that you would assume was specific as to evidence," the public defender replied: "No, nothing evidentiary. . . . When the one girl was just, like, if we can just convict or get this done, and there's nothing anyone can say to me. That was the part that kind of, I don't know, bothered me, not because of the position she takes, but the fact that she's expressing something." (*Id.* at 5-6.) The trial judge addressed the entire jury and told them there had been a report "that during your break several of our jurors were on the elevator discussing the case, not necessarily content, but maybe just frustrations in terms of the way the deliberations were going, the ability to reach a decision," which he told them amounted to misconduct that could lead to a mistrial. (*Id.* at 9-10.) The trial judge asked the jury foreperson: "Without going into any detail whatsoever regarding what's transpired in the jury room, do you feel that my announcement that there's been a report that there were discussions outside the jury room, do you feel anything of that nature has trickled into the jury room and affected deliberations?" (*Id.* at 11.) The foreperson answered: "No, I do not." (*Id.*) The jury

deliberated for the rest of that Monday, and on Tuesday morning requested and received a readback of the testimony of a deputy sheriff who testified as to the victim's demeanor, level of intoxication and identification of Petitioner, which, as set forth below, the appellate court found highly relevant to essentially the only issue before the jury, whether the victim consented to have sex with Petitioner, and they reached their verdicts Tuesday afternoon. (ECF No. 7-1 at 182-86.)

Petitioner appealed, raising a single claim, the same claim presented here, that his Sixth and Fourteenth Amendment rights to a fair trial and an unbiased, impartial jury were violated by the failure of the trial judge to adequately investigate potential juror bias or impartiality by holding an evidentiary hearing and questioning the individual jurors. (ECF No. 7-10; ECF No. 1 at 5; ECF No. 1-2 at 4-12.) On November 20, 2019, the appellate court affirmed. (ECF No. 7-13, *People v. Peay*, D074754, slip op. (Cal.App. Ct. Nov. 20, 2019).) It stated that it had independently reviewed the record and came to the same conclusion as the trial judge, that "[a]lthough there was juror misconduct, it did not result in bias, impartiality or error." (*Id.* at 9.) On July 6, 2020, over six months after a petition for review in the state supreme court would have been due, Petitioner presented the same claim to the state supreme court in a habeas petition rather than a petition for review. (ECF No. 7-14.) The state supreme court denied relief on August 26, 2020, with an order which stated in full: "The petition for writ of habeas corpus is denied. (See *In re Dixon* (1953) 41 Cal.2d 756, 759 (courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal).)" (ECF No. 7-15.)

Respondent answers that federal habeas relief is unavailable because Petitioner's claim is procedurally defaulted since it was denied by the state supreme court on the basis of an adequate and independent state procedural rule which precludes raising claims on habeas which could have been but were not raised on direct appeal. (ECF No. 6-1 at 3-4.) Respondent contends Petitioner cannot make a showing of cause and prejudice to excuse the default because his claim is meritless under any standard of review. (*Id.*) Petitioner replies that no default occurred, or if one did it should be excused, because his appellate

counsel raised the claim in a petition for review in the state supreme court on direct appeal which was erroneously labeled as a habeas petition, and the decision by the state supreme court to impose the procedural bar rather than ignore the erroneous label was an arbitrary and capricious abuse of discretion. (ECF No. 9 at 5-12.)

## II. Trial Proceedings

The following statement of facts is taken from the appellate court opinion on direct appeal. The Court defers to state court findings of fact and presumes they are correct. *Sumner v. Mata*, 449 U.S. 539, 545-47 (1981).

> Jaime S. and her boyfriend Sean H. went to a military ball in October 2017. Jaime had about six drinks while out. They started to argue as they left the ball. Before they arrived at Sean's apartment in La Mesa, a deputy sheriff had responded to a noise complaint of two men listening to music in the apartment's parking lot. One of the men matched a description of Peay.
>
> When Jaime and Sean arrived at the apartment, a neighbor, Derrick H., and his friend, Yarub A., were drinking outside in the parking lot. Jaime and Sean went into their apartment and continued to argue. Jaime asked Sean to leave the apartment.
>
> After Sean left, Jaime went outside with a partial bottle of wine to socialize with Derrick and his friend. Jaime drank a few more glasses of wine as she chatted with the men. Derrick pointed to another friend of his, Peay, who was on the stairs and appeared to be falling asleep. Jaime went over to make sure the man was alright, then returned to continue talking with Derrick and Yarub. Jaime had never seen or met Peay before. Peay was wearing a black jacket, red shirt, and a red hat. He appeared to be heavyset, weighing about 240 pounds in Jaime's estimation. Peay appeared to be heavily intoxicated.
>
> Jaime went into her apartment at about 12:30 a.m. She noticed that Sean had left his keys inside the apartment, so she unlocked the door to allow him to enter the apartment when he returned. She undressed, went to bed and fell asleep.
>
> Yarub went back to his apartment soon after Jaime left. From his balcony, Yarub saw Peay jump over a gate and enter Jaime's apartment through a sliding glass door.

Jaime awoke to a man on top of her with his penis inside her vagina. Penetration lasted for five or ten seconds while Jaime came fully awake. She fought against the stranger, hitting and yelling, and ripped his shirt off. She forced him down the hallway and out of her apartment. His red hat and lanyard came off as Jaime hit him. He ran out. Jaime locked the door behind him. Yarub saw Jaime cursing and yelling, "How could you, how could you," as Peay was leaving the apartment.

Jaime called 911. She told the operator a man had been on top of her and raped her. Jaime was crying and nervous when the police arrived. She gave the police the lanyard and the hat that Peay had left behind. The lanyard contained an identification card with Peay's name and photograph on it.

Jaime testified she did not permit anyone to enter her apartment that night and did not consent to sex or any other touching. She did not invite Peay into her apartment and did not consent to sex with him.

Jaime had a medical exam the morning after the rape. Vaginal, external genital, and anal swabs from Jaime all contained DNA that had an extremely high possibility of being from Peay. Jaime's blood alcohol concentration, collected between 6:00 and 8:00 a.m., was .13.

Peay admitted that he had sex with Jaime but claimed that it was consensual. He said that Jaime came out of her apartment after Derrick and Yarub left, invited Peay in, and initiated sex with him.

After the jury was selected and sworn, and before testimony began, the court instructed the jury not to discuss the case with anyone until after it was directed to begin deliberations, and then only in the jury room and only when all 12 jurors were present. The court gave this admonishment again the next day, before opening statements.

Arguments and instructions concluded and the case was submitted to the jury on a Friday. The jurors deliberated for about an hour and a half that afternoon, then were released for the weekend. The following Monday, the attorneys informed the court that juror misconduct may have occurred during the morning break.

The court heard evidence from an attorney not connected to this case. The attorney told the court that she overheard four jurors discussing the case in the courthouse elevator. She said that one of the jurors talked about how

long the deliberations would continue and when they could get it done. Another juror asked if there were a cut-off point, and a third juror said deliberations would continue until finished. A fourth said that no one would change her vote; she was tired of the trial and "(w)e just need to be done." She also said something to the effect of, "If we can just get to convicting." The jurors continued talking after they left the elevator, but the attorney did not follow them. The attorney said they did not discuss specific evidence from the trial. The court summarized the evidence as frustration with how long deliberations were taking, wondering if the judge would cut off the deliberations, and one juror asking, "if we can just convict or get this done," because she was not going to change her vote.

Peay moved for mistrial due to juror misconduct. The court weighed the gravity of the misconduct. It considered that there was no discussion about the evidence in the case. The court found the jurors expressed frustration about an inability to reach a decision but no prejudice was shown by the jurors toward either side. The court found misconduct occurred but it was not substantial enough to find prejudice or declare a mistrial. The court denied Peay's motion for mistrial.

The jurors returned to the courtroom. The court told the jurors it heard a report of several jurors discussing the case on the elevator, not the content of the case but their frustration during deliberations and the inability to reach a decision. The court emphasized to all 12 jurors that it was improper to discuss anything about the case outside the deliberations room, including general matters such as scheduling, length of the session, or how long deliberations would take. The foreperson did not think any discussions from outside the jury room had trickled into the jury room or affected deliberations. The court reminded the jurors of the importance of their obligation and told them not to express frustrations.

The jurors continued deliberating for the remainder of the day and the next day. They requested and received a read-back of the testimony of one of the deputy sheriffs who responded to the rape call. He testified about Jaime's demeanor, her level of intoxication, and the identification of Peay from the identification card in his lanyard that was left behind.

On the afternoon of the third day of deliberations, the jury returned guilty verdicts on both felony counts charged.

(ECF No. 7-13, *People v. Peay*, D074754, slip op. at 2-3.)

### III. Petitioner's Claim

The failure of the trial court to adequately investigate potential juror bias by holding an evidentiary hearing and questioning the jurors resulted in a violation of Petitioner's right to a fair trial by an impartial, unbiased jury as protected by the Sixth and Fourteenth Amendments to the United States Constitution. (ECF No. 1 at 5; ECF No. 1-1 at 4-12.)

### IV. Discussion

The Court finds habeas relief is unavailable because: (1) Petitioner's claim is procedurally defaulted, (2) even assuming it is not defaulted or Petitioner could overcome the default, the state court adjudication of the claim is not contrary to and does not involve an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts, and (3) any error is harmless.

#### A. Procedural Default

Respondent first contends Petitioner's claim is procedurally defaulted because it was denied by the state supreme court on the basis of an adequate and independent state procedural rule which precludes raising claims on habeas which could have been but were not raised on direct appeal. (ECF No. 6-1 at 3.) Respondent argues Petitioner has not attempted to make a showing of cause and prejudice to excuse the default, and that he cannot do so because the claim is meritless under any standard. (*Id*. at 3-4.)

Petitioner, who was represented by the same retained law firm at trial (ECF No. 7-1 at 15), on direct appeal (ECF No. 7-10 at 1), on state habeas (ECF No. 7-14 at 1), and in this Court (ECF No. 1-2 at 1), replies that no default occurred, or if one did it should be excused, because he experienced issues immediately after his appeal was denied while he was incarcerated communicating with family and counsel, and because the claim was raised in a petition for review in the state supreme court which was erroneously labeled by appellate counsel as a habeas petition, and the decision by the state supreme court to impose the procedural bar rather than ignore the erroneous label was an arbitrary and capricious abuse of discretion. (ECF No. 9 at 5-12.)

///

Petitioner's retained appellate counsel presented the claim to the state appellate court on direct appeal. (ECF No. 7-10.) On November 20, 2019, the appellate court affirmed the conviction and denied the claim on the merits in a reasoned opinion. (ECF No. 7-13.)

A petition for review of an appellate court opinion is required to be filed in the California Supreme Court within ten days of the date the appellate court decision is final. *Forrest v. Vasquez*, 75 F.3d 562, 563 (9th Cir. 1996), citing Rule 28(b) of the California Rules of Court. The appellate court opinion became final thirty days after it was issued on November 20, 2019. *See* Rule 8.366(b)(1) of the California Rules of Court. However, on July 6, 2020, over six months after a petition for review would have been timely in the state supreme court, Petitioner's retained appellate counsel presented the claim to the state supreme court in a habeas petition rather than a petition for review. (ECF No. 7-14.) The state supreme court denied relief on August 26, 2020, with an order which stated in full: "The petition for writ of habeas corpus is denied. (See *In re Dixon* (1953) 41 Cal.2d 756, 759 (courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal).)" (ECF No. 7-15.)

In order to preclude federal habeas review based on a procedural default, a state procedural bar must rest on a state ground which is "independent" of federal law and "adequate" to bar federal review. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). To be "independent" the state law basis for the decision must not be interwoven with federal law. *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983). To be "adequate," the state procedural bar must be "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. Bean*, 96 F.3d 1126, 1129 (9th Cir. 1996).

Respondent has the initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review. *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). If Respondent is successful, the burden shifts to Petitioner to challenge the independence or adequacy of the procedural bar. *Id.* If Petitioner satisfies his burden, the ultimate burden of establishing that the procedural rule precludes federal habeas relief shifts to Respondent. *Id.*

California's *Dixon* bar, which provides that state habeas is not available for claims which could have been raised on appeal but were not, has been found to be an adequate and independent state procedural bar sufficient to uphold a procedural default in this Court. *See Johnson v. Lee*, 578 U.S. __, 136 S.Ct. 1802, 1807 (2016) (holding that California's *Dixon* bar is adequate to support a procedural default); *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (holding that California's *Dixon* rule is independent of federal law as applied after 1998). Respondent has therefore carried the initial burden by identifying California's *Dixon* rule as precluding federal review. The burden has shifted to Petitioner, which he may satisfy "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Bennett*, 322 F.3d at 586.

Petitioner argues that it was an arbitrary and capricious abuse of discretion for the state supreme court to treat his habeas petition as it was labeled, a habeas petition, rather than construe it as an untimely petition for review. (ECF No. 9 at 5.) Petitioner argues the state supreme court "washed its hands of the case" and should have either ruled on the merits as if it were a petition for review or inquired as to whether it had been improperly labeled and provided him an opportunity to correct the mistake, and states that "[i]t is Peay's position that the California Supreme Court decision to deny his moving papers without actually reading them was a miscarriage of justice and an abuse of discretion." (*Id.* at 5-6.) Petitioner contends that because he raised his claim on appeal in the appellate court on direct appeal, the denial by the state supreme court on the basis that the claim could have been but was not raised on direct appeal was a clear error of judgment. (*Id.* at 5-12.)

There are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376 (2002) (finding no default where the "essential requirements" of a trial rule which "serves a governmental interest of undoubted legitimacy" were substantially complied with), citing *Osborne v. Ohio*, 495 U.S. 103, 124 (1990) (recognizing general applicability of state rule requiring contemporaneous objection to jury

charge, but finding no default because the rule served no perceivable state interest in an atypical instance where earlier objection had been made) and *Staub v. City of Baxley*, 355 U.S. 313, 319-20 (1958) (holding that failure to challenge specific sections of ordinance did not support a default where party challenged constitutionality of entire ordinance in which all sections were interdependent).

      Petitioner has failed to show that California's *Dixon* rule was applied unfairly in this case.  Petitioner's counsel waited over six months after a petition for review would have been timely in the California Supreme Court on direct appeal to file a habeas petition in that court.  He has come forward with no evidence that he sought permission to file a late petition for review in the state supreme court, as California procedure permits, or that he even brought to the attention of that court that he wished his habeas petition to be treated as a petition for review.  *See* Rule 8.500 of the California Rules of Court ("The time to file a petition for review may not be extended, but the Chief Justice may relieve a party from a failure to file a timely petition for review if the time for the court to order review on its own motion has not expired.")  Under these circumstances Petitioner has shown nothing arbitrary about the decision of that court to treat the habeas petition as it was labeled rather than as an untimely petition for review.  Petitioner is also incorrect in contending that because he raised his claim in the *appellate* court on direct appeal but not in a petition for review in the state supreme court, the *Dixon* rule was applied erroneously.  By stating that the claim could have been but was not raised on direct appeal, the state supreme court presumably found the claim had not been raised in the state *supreme* court on appeal.  *See Fields v. Calderon*, 125 F.3d 757, 761 (9th Cir. 1997) ("Because the *Dixon* rule precludes collateral review of a claim that could have been brought on direct appeal, the procedural default, though announced by the California Supreme Court when the habeas petition is denied, technically occurs at the moment the direct appeal did not include those claims that should have been included for review."); *see e.g., Manning v. Price*, 2016 WL 11359237 at \*5 (S.D. Cal. 2016) (recognizing that in order to properly raise a claim on direct appeal to the California Supreme Court following a denial by the state appellate court, a defendant

must file a petition for review in the California Supreme Court and not a habeas petition), citing Rules 8.500, 8.508 of the California Rules of Court. Because Petitioner has not carried his burden under *Bennett*, his claim is procedurally defaulted.

The Court can address the merits of a procedurally defaulted claim if Petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or if a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim. *Coleman*, 501 U.S. at 750; *Schlup v. Delo*, 513 U.S. 298, 316 (1995) (holding that a showing of fundamental unfairness needed to overcome a procedural default requires a presentation of "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial.") Petitioner has made no effort to make such a showing and none is apparent on the record. Even if he could show cause, he cannot show prejudice because as set forth below his claim fails on the merits. Accordingly, federal habeas relief is denied on the basis that Petitioner's claim is procedurally defaulted.

**B.     Merits**

Even if no default occurred or could be overcome, habeas relief is unavailable for two additional reasons, because the state court adjudication of the claim is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts, and because any error is clearly harmless.

In order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth

in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id*. at 407. In order to satisfy § 2254(d)(2), the factual findings relied upon by the state court must be objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

The Court applies the provisions of 28 U.S.C. § 2254(d) to the last reasoned state court decision addressing the claim. *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). In this case, that is the appellate court opinion on direct appeal, which stated:

> "A criminal defendant has a constitutional right to trial by an impartial and unbiased jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; (citation).) "A deprivation of that right occurs even if only one juror is biased." (*People v. Merriman* (2014) 60 Cal.4th 1, 95 (*Merriman*).) The touchstone of juror misconduct is bias or impartiality. Jurors are impartial if able to render a verdict based on the evidence presented in court, setting aside opinions or impressions not based on the admitted evidence. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 485.) A rebuttable presumption of prejudice arises when one or more jurors are exposed to extraneous material that is inherently prejudicial, or when it is substantially likely that a juror was actually biased against the defendant. (*Merriman*, at p. 95; *People v. Nesler* (1997) 16 Cal.4th 561, 579; *In re Carpenter* (1995) 9 Cal.4th 634, 650-655.) Prejudice and bias in the legal context do not mean damage to the defendant that naturally flows from relevant, highly probative evidence. Bias and prejudice refer to an emotional bias against a party based on factors extraneous to the evidence at trial. (See *People v. Young* (2019) 7 Cal.5th 905, 927 (*Young*).)
>
> When a trial court is aware of possible juror misconduct, it should make whatever inquiry is reasonably necessary to resolve the matter. It has great discretion in determining the scope of the inquiry. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1284 (*Virgil*).) The trial court's investigation of the allegations was sufficient here. (*Ibid*.; *People v. Ledesma* (2006) 39 Cal.4th 641, 738 (*Ledesma*).) The reporting party was a defense attorney who knew the importance of impartial jurors. The jurors did not discuss the evidence

from the trial or any extraneous evidence. The jurors did not communicate in any significant manner with a nonjuror. A third party overhearing conversations about the length of deliberation, and not about any fact related to the case, is not an unauthorized communication with a nonjuror concerning a matter pending before the jury. (*Merriman, supra*, 60 Cal.4th at p. 95.) What the reporting party heard did not suggest there was more juror misconduct to be discovered. (*Ibid*.) The comments overheard by the attorney did not suggest an ongoing discussion of the case, search for new information about the facts, or other fishing for extraneous material. The scope of the court's investigation of misconduct was sufficient. (*Virgil*, at p. 1284.)

We review the entire record, including the nature and circumstances of the misconduct, to determine if there is a substantial likelihood that the jurors in question were actually biased against the defendant. In conducting this review, we accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence and independently apply the law to those historical facts. (*Merriman, supra*, 60 Cal.4th at pp. 95-96.)

The improper discussion by the jurors did not involve any extraneous evidence. A presumption of prejudice could therefore arise only if it were substantially likely that any juror was actually biased against the defendant. (*Merriman, supra*, 60 Cal.4th at p. 95; *Carpenter, supra*, 9 Cal.4th at pp. 650–655.) Firm opinions by some of the jurors after deliberations began do not demonstrate actual bias against Peay. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75 (*Allen*); *Ledesma, supra*, 39 Cal.4th at pp. 729-730.) The Supreme Court has noted that it is not uncommon to hold a vote at the beginning of deliberations to find out the level of consensus and issues to be explored. (*Allen*, at p. 75; *Ledesma*, at pp. 729-730.) The *Allen* court stated, "We cannot reasonably expect a juror to enter deliberations as a *tabula rasa*, only allowed to form ideas as conversations continue. What we can, and do, require is that each juror maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination. (*Allen*, at p. 75.)

The out-of-jury room discussion here occurred after about three hours of deliberation-an hour and a half or so on Friday afternoon and the same on Monday morning before the mid-morning break. Because Peay admitted sexual intercourse, there was only one question for deliberation: did the victim consent to sex with Peay or did Peay act without her consent. Yarub's testimony that Peay jumped over a gate and entered Jaime's apartment

through a sliding glass door was strong evidence that Jaime did not go outside and invite Peay into her apartment. There was no impropriety or suggestion of bias in jurors having formed an opinion on the case after submission and a few hours of deliberation. And, regardless of what the jurors had said rhetorically, they continued to deliberate and to examine the evidence for another full day-the rest of Monday and past lunch the following day. The jurors heard the read-back of testimony from the deputy who had responded to the scene. His testimony on the victim's demeanor was highly relevant to the question of consent. Apparently the jurors continued a rational and collegial discussion before coming to a unanimous opinion.

The discussion outside the presence of all jurors was improper, but it did not raise a presumption of prejudice. The comments would not have been misconduct if they had occurred in the jury room. No extraneous evidence was discussed or discovered. There is no evidence that the jurors were emotionally biased against Peay based on extraneous factors. Nothing in the record supports Peay's statements in the conclusion of his brief that the jury was racially biased and tainted by inadmissible character evidence.

Although there was juror misconduct, it did not result in bias, impartiality or error.

(ECF No. 7-13, *People v. Peay*, No. D074754, slip op. at 6-9.)

Petitioner argues that the trial judge should have done more than just ask the jury foreperson for an opinion as to whether the misconduct affected deliberations, such as holding an evidentiary hearing and asking the juror what she meant by her statement "we need to get convicting." (ECF No. 9 at 15.) He contends:

The court never inquired as to whether they were ready to convict because of racial bias? Were the jurors eager to vote guilty because, they felt that was the quickest way for them to go home? How many jurors felt this way? Were members of the jury truly upholding their duties as jurors? Were all jurors being fair and impartial? Were they voting based on the evidence presented or were their votes influenced by peer pressure to quickly reach a verdict?

(*Id.*)

Clearly established federal law does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties. *Tracey v. Palmateer*, 341

F.3d 1037, 1045 (9th Cir. 2003), citing *Remmer v. United States*, 347 U.S. 227, 229-30 (1954) (holding that a trial court should "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate") and *Smith v. Phillips*, 455 U.S. 209, 217-18 (1982) (finding no error where trial court, during questioning of one juror about potential misconduct, declined to inquire about other jurors who were potentially subject to misconduct); *see also Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (trial court need not order a hearing sua sponte whenever presented with evidence of juror bias). The Supreme Court has declined to establish a rule requiring a separate hearing whenever there are allegations of juror misconduct, requiring only that: "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Phillips*, 455 U.S. at 217.

As the appellate court noted, the trial judge here conducted an inquiry where the public defender who overheard the statements relayed them to the court and the trial judge thereafter determined the jurors had only discussed "not necessarily content, but maybe just frustrations in terms of the way the deliberations were going, the ability to reach a decision," rather than anything of substance with respect to their deliberations, and then accepted the foreperson's assurance that the misconduct had not encroached on or affected their deliberations. (ECF No. 1-7 at 10-11.) Thus, the trial judge considered the contents of the jurors' statements, the seriousness of the subject matter and the impact on their deliberations, all as required by Supreme Court precedent, before deciding not to inquire further. *See Sims*, 414 F.3d at 1155 (noting that the Ninth Circuit has recognized that Supreme Court case law provides that when a court is confronted with a claim of juror misconduct or bias it "should consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source when determining whether a hearing is required.") (internal quote marks omitted). Petitioner's speculation that his list of unasked questions quoted above could have revealed bias is insufficient to carry his

burden of showing that the independent determination by the appellate court that the trial judge made an adequate inquiry is contrary to or involves an unreasonable application of the clearly established federal law as required by 28 U.S.C. § 2254(d)(1).

Petitioner also contends the failure of the trial court to develop the factual record by holding an evidentiary hearing and questioning the jurors resulted in an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(2). (ECF No. 9 at 13-15.) Before the Court "can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014) (recognizing that an intrinsic challenge to the adequacy of state court factual findings is controlled by *Taylor* but extrinsic challenges based on evidence never developed in state court is controlled by *Pinholster*), citing *Cullen v. Pinholster*, 563 U.S. 170, 184 (2011) (holding that a federal habeas court may only consider evidence presented in the state court proceedings when applying 28 U.S.C. § 2254(d)(2)). "If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts." *Taylor*, 366 F.3d at 1001, citing *Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir. 1999) and *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003).

Here, the state court made its evidentiary finding after it held a hearing at which a disinterested witness informed the court of the content of the jurors' statements which involved the length of, and not substantive information about, their deliberations, and at which the jury foreperson assured the court that the misconduct had not entered the jury room or affected the deliberations. Not only was a hearing held and a finding made that the jury misconduct did not result in or evince jury bias or impartiality, that finding is supported by the record. As set forth above, after the misconduct occurred during the

Monday morning break, the jury continued deliberating for the rest of that day and into the next, during which they requested a readback of testimony of a witness to the victim's demeanor and identification of Petitioner, highly relevant evidence regarding the main issue the jury faced, whether the victim consented to sex with Petitioner.  Accordingly, Petitioner has not established that the state court adjudication of his claim involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings within the meaning of 28 U.S.C. § 2254(d)(2).

Petitioner also argues that there are situations so extraordinary as to allow the Court to presume juror bias.  (ECF No. 9 at 16.)  "Implied bias is found 'in those extreme situations "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances."'"  *Rodriquez v. County of Los Angeles*, 891 F.3d 776, 804 (9th Cir. 2018), quoting *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007) (en banc), quoting *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990).  The Ninth Circuit has identified four situations where juror bias may be implied:

> (1) where the juror is appraised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent judgment even if the juror states he will, (2) the existence of certain relationships between the juror and the defendant, (3) where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern, and (4) where it is revealed that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or that the juror was a witness or somehow involved in the underlying transaction.

*Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008), quoting *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1062 (9th Cir. 1997).  Nothing similar to any of those situations is involved in this case.  Petitioner argues that the jurors' statements regarding the need for a prompt resolution of the case could be read as an indication they were willing to forego their duties as jurors in order to either complete their service quickly or appease the majority of jurors but contends no one will ever know because only the foreperson was

questioned by the trial judge rather than the jurors who made those statements. (ECF No. 9 at 16.) Petitioner has not shown that the misconduct in this case, jurors discussing in public during deliberations the length of their deliberations or expressing frustration that they are taking too long in a case with essentially only one issue in dispute, the credibility of the victim measured against Petitioner's credibility regarding whether their sexual encounter was consensual, is the type of extraordinary situation where juror bias can be implied or presumed.

Finally, even assuming Petitioner could establish that a federal constitutional violation arose from the juror misconduct, for example, by the statement of the one juror that she had already made up her mind and was not going to change her vote, he is required to "show that the alleged error 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Jeffries v. Blodgett*, 5 F.3d 1180, 1189-90 (9th Cir. 1993), quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946); *see also Fields*, 503 F.3d at 781 (applying *Brecht* in case involving juror misconduct).

The misconduct, which amounted at most to an expression of frustration over the length of deliberations with respect to essentially a single issue, consent, occurred after the jury had been deliberating about an hour and a half on Friday afternoon and the same amount of time the next Monday morning. As the state court noted,

> And, regardless of what the jurors had said rhetorically, they continued to deliberate and to examine the evidence for another full day - the rest of Monday and past lunch the following day. The jurors heard the read-back of testimony from the deputy who had responded to the scene. His testimony on the victim's demeanor was highly relevant to the question of consent. Apparently the jurors continued a rational and collegial discussion before coming to a unanimous opinion.

(ECF No. 7-13, *People v. Peay*, No. D074754, slip op. at 9.)

There is no basis to find that the expression of frustration by the jurors of the length of their deliberations after having deliberated Friday afternoon and Monday morning over a single, straightforward issue to be resolved, whether the victim consented to have sex

with Petitioner, had any effect on their verdict, must less a substantial and injurious one. Even if the statement of the one juror that she was not going to change her vote went further than mere frustration with the length of the deliberations, it was made after the jury had been deliberating for about three hours over two court days, Friday and Monday, not, for example, with little or no deliberation.  The record supports the finding of the state appellate court that the jurors deliberated longer after the misconduct than they had already been deliberating at the time of the misconduct, during which they seriously considered the issue of intent before reaching a verdict.

In sum, habeas relief is denied on the basis that: (1) the sole claim presented in the Petition is procedurally defaulted, (2) assuming it is not defaulted or Petitioner could overcome the default the adjudication of the claim by the state court is objectively reasonable within the meaning of 28 U.S.C. § 2254(d), and (3) any federal constitutional error is harmless.

## V. Certificate of Appealability

The Court is required to grant or deny a Certificate of Appealability when entering a final order adjudicating a 28 U.S.C. § 2254 habeas petition.  *See* Rule 11, rules foll. 28 U.S.C. § 2254.  "[T]he only question [in determining whether to grant a Certificate of Appealability] is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented [including procedural issues] are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. ___, 137 S.Ct. 759, 773 (2017).  Under that standard, because juror misconduct occurred, and because the default was allegedly caused at least in part by communication issues during incarceration, the Court finds that the issues

/ / /
/ / /
/ / /
/ / /
/ / /

are adequate to deserve encouragement to proceed further, and that a Certificate of Appealability is appropriate as to the sole claim presented in the Petition and on the procedural default issue.

**VI.   Conclusion and Order**

Based on the foregoing, the Petition for a Writ of Habeas Corpus (ECF No. 1) is **DENIED** and the Court **ISSUES** a Certificate of Appealability.

The Clerk of Court shall enter judgment accordingly.

Dated:  May 3, 2021

Hon. William Q. Hayes
United States District Court